MAYOR & BOARD OF ALDERMEN OF CITY OF NATCHEZ, et al. v. ENGLE, et al.

Division A. Jan. 15, 1951.

No. 38032 (49 So. (2d) 808)

April 2, 1951 (51 So. (2d) 564)

Gerard **H**. **Brandon** and **Laub, Adams, Forman & Truly**, for appellants.

**C. F. Engle, Fred C. Berger, L. A. Whittington** and **Coleman & Green,** for appellees.

Holmes, C.

 The record discloses that the questions involved on the merits of this case are of great public interest, and accordingly it is the opinion of the Court that the motion to advance this cause on the docket for final hearing should be and it is hereby sustained, and the case is set for hearing on the 19th day of February, 1951. The appellants shall file their briefs on or before January 29, 1951, and the appellees shall file their briefs on or before February 9, 1951. Motion sustained.

PER CURIAM.

The above is hereby adopted as the decision and action of the Court.

**Kyle, J.**

This is an appeal by the mayor and board of aldermen of the City of Natchez and others from a decree of the chancery court of Adams County cancelling a contract entered into by and between the City of Natchez, acting by and through its mayor and board of aldermen, and the investment banking firms of Scharff & Jones, Inc., White, Hattier & Sanford, and John Nuveen & Company, providing for the rendering of certain services by the above named investment bankers in connection with the preparation of plans for the issuance and sale of revenue bonds of the City of Natchez for the purpose of improving and extending the water and sewer systems of the city.

The suit was filed by Charles F. Engle as a taxpayer, for himself and for the use and benefit of all other taxpayers and householders of the City of Natchez, all of whom were invited to join therein as complainants, against the mayor and board of aldermen of the City of Natchez and the above named investment banking firms, and after the filing of the bill of complaint Fred C. Berger intervened as a taxpayer and a party complainant.

The contract which the complainants asked to have declared null and void was dated August 23, 1949, and was as follows:

"August 23, 1949

"Hon. Mayor and Board of Aldermen

"City of Natchez

"Natchez, Mississippi

"Re: Approximately $2,500,000, City of Natchez, Mississippi, Utilities Revenue and Public Improvement Bonds.

"Gentlemen:

"In view of the magnitude and complexity of this financing program, it is of the utmost importance that the maximum of care, concern and study be given it. Among other things, the determination of the respective

amounts of Utilities Revenue and Public Improvement Bonds, from the standpoint of providing maximum flexibility and provision for the city's future fiscal operations, is of great significance. Accordingly, we agree to make a detailed survey of the city's past, present and future fiscal situation, and in accordance with the conclusions of such survey, to submit to you as soon as possible and in any event. on or before October 15, 1949 detailed plans for accomplishing this financing.

"When, as and if we have mutually agreed as to the detail of such over-all financing program, including the respective amounts of Utilities Revenue and Public Improvement Bonds that should be issued, we will arrange for Messrs. Charles & ·Trauernicht, Bond Attorneys of St. Louis, Missouri, or, in case Charles & Trauernicht cannot accept employment, then a firm of bond attorneys of equal ability and reputation, to prepare the legal proceedings leading to the authorization and issuance of both types of bond issues. The bonds shall be sold at public advertised sale on or before Devember 15, 1949, or such later date as is necessary and is approved by us, in accordance with the law under which they are to be issued, and shall be awarded to the best bidder therefor at said public sale. At such time that said legal proceedings authorizing the bonds to be issued have been approved by the city we will prepare a detailed prospectus containing information of interest to bidders for these bonds. This prospectus shall be made available to the city in sufficient quantity to fill requests of prospective bidders for these bonds at least two weeks prior to the date on which said bonds are advertised for sale. At such time that Messrs. Charles & Trauernicht can render their unqualified approving opinion as to the legality of the bonds, they shall be delivered to the purchaser thereof upon payment therefor at the price bid for said bonds.

"We agree to submit a bid at said public sale of 103-¾ % of par value and accrued interest, for bonds to bear

interest at such rate or rates as we shall designate in said bid, said rate or rates to result, however, in an interest cost to the City of Natchez on this financing, computed to the absolute maturity thereof, of not exceeding 3-½%. We also agree to assume the expense of (a) the fees and charges of Messrs. Charles & Trauernicht for their services rendered in connection with the issuance and approval of the bonds; (b) the cost of printing of such bonds; (c) the cost of delivery of such bonds to the purchaser thereof. For our services rendered and expenses incurred in connection herewith, the city shall pay us a fee, at the time of delivery of said bonds to the purchaser thereof, a sum equal to 3-¾% of the amount of bonds issued. In considering the bids received for the bonds at public sale, and calculating the net interest cost on such bids, it is mutually agreed that the fee to be paid us for our services rendered and expenses incurred hereunder shall not be considered in connection with our bid for said bonds, (in view of the liability of the city for the payment of such fee being the same regardless of which bid is accepted), and all bids received for said bonds shall be figured in accordance with the provisions of the notice of sale and on the same basis.

"In the event the initial financing survey to be prepared by us does not in our opinion justify the issuance of mutually satisfactory over-all detailed plan for the issuance of this financing, or if these bonds fail of approval at election, or if Messrs. Charles & Trauernicht cannot render their written unqualified approving opinion as to the legality of the bonds thereof, then in any of such events by our tendering written advice to the city by registered mail of our desire to terminate this agreement, such agreement shall be terminated and we shall assume all expenses for which we are hereunder liable to such date, and thereafter neither of us shall have any liability in connection with this financing to the other.

"This offer is for prompt acceptance and your acceptance of it and acknowledgment of the same in the space

provided below shall cause this offer to constitute a contract between the City of Natchez, Mississippi and the undersigned.

"Respectfully submitted,
"John Nuveen & Co.
"By: Frank C. Carr
"Scharff & Jones, Inc.
"By: Ike D. Scharff
"White, Hattier & Sanford
"By: J. B. Sanford, Jr.

"Accepted for and on behalf of the City of Natchez, Mississippi, this 23rd day of August, 1949.

"Audley B. Conner
"Mayor, City of Natchez, Miss.

"Attest:
"Sam F. Junkin
"City Clerk
"City of Natchez, Miss."

The complainants in their bill of complaint alleged that the contract was wholly illegal, invalid and unenforceable, and if carried out would work irreparable injury to the complainants and all other taxpayers and householders in the City of Natchez. The complainants also alleged, as special grounds for holding that the contract was invalid, that the contract constituted a pre-election agreement for the sale of bonds which had not been authorized by a vote of the people, that the contract nullified the statutory requirement that such bonds be sold only after legal advertisement and upon competitive bids, that the contract undertook to fix in advance of an election the terms of sale of the bonds and to divert a part of the proceeds to be derived from the sale of the bonds to a purpose other than that authorized by law, and that the services to be rendered by the investment bankers in making a survey of the financial condition of the city and the fiscal problems involved in the proposed bond issue were vague, indefinite and meaningless, and that in making such survey the investment bankers would be

in a position to take advantage of information obtained by them and become the successful bidders for said bonds at an excessive rate of interest.

The complainants asked that the court by proper decree cancel the contract on the ground that said contract was illegal, contrary to public policy and void, and that the court enjoin the mayor and board of aldermen from paying out any money to the defendants for services rendered under the contract; and in their amended bill the complainants asked that the mayor and board of aldermen be restrained and enjoined from proceeding to hold an election on the issuance and sale of the bonds proposed to be issued under the terms of the alleged contract.

The mayor and board of aldermen of the city of Natchez and the investment bankers filed separate answers to the original and amended bills of complaint, and in their answers denied that the contract was illegal or invalid for any of the reasons set forth in the original or amended bill of complaint, and the defendants denied that the complainants were entitled to any of the relief prayed for in the original or amended bill of complaint.

Many other minor questions were presented in the pleadings which we do not deem it necessary to mention at this time.

Voluminous testimony was taken before the chancellor upon the hearing. The financial problems involved in undertaking to provide adequate water and sewerage facilities for the inhabitants of the rapidly growing city were fully developed in the testimony of the witnesses who testified on behalf of both complainants and defendants; and the efforts made by the mayor and board of aldermen during the three-year period immediately preceding the date of the above mentioned contract to work out the details of a plan for the improvement and extension of the water and sewerage systems of the city, so as to provide an adequate water supply and sanitary sewerage facilities for the city, were likewise shown by the testimony of the witnesses.

The proof showed that the mayor and board of aldermen in 1946 had employed Black & Veatch, consulting engineers of Kansas City, Missouri, to make the necessary surveys and detail plans and specifications for the improvement and extension of the water and sewerage systems of the city, and that these engineers had performed the services required of them and had filed their report with the mayor and board of aldermen during the month of February, 1948; and that the mayor and board of aldermen had thereafter employed Wiedman & Singleton, engineers of Atlanta, Georgia, to prepare plans and specifications for the extension of the water treatment plant belonging to the city, and that this firm of engineers had filed their report some time prior to the date of the above mentioned contract entered into with the investment bankers. It also appears from the record that the report filed by Black & Veach in 1948 showed that the estimated cost of the water and sewerage improvements and extension recommended by them at that time would amount to approximately $1,800,000. But after the making of the Black & Veatch survey, which was completed some time during the year 1947, new industrial and residential subdivisions had been laid out and it was necessary that additional extensions be made which were not provided for in the Black & Veatch report; and at the time negotiations were entered into with the investment bankers, it was estimated that the cost of the proposed water and sewerage extension program would amount to $2,400,000.

The foregoing statement constitutes a summary of the facts relating to the so-called "financing program" referred to in the first paragraph of the written offer of the investment bankers which was accepted by the mayor and board of aldermen on August 23, 1949.

The chief witness who testified for the investment bankers concerning the written offer made by the investment bankers and accepted by the mayor and board of aldermen on August 23, 1949, was Frank C. Carr, of the

investment banking firm of John Nuveen & Company, of Chicago. This firm, according to the testimony, had provided the chief advisory and technical services which had been rendered by the investment bankers in the execution of the contract. Carr testified that the City of Natchez, at the time the investment firms were employed, was "in very bad shape as far as being in a position to issue the indebtedness that was required to finance the cost of the improvements", in that (1) the water system owned by the city had been operating for many years at a very small profit, and in some years had actually shown an operating deficit; (2) the city had no record of experience of sewerage revenue collections, as no sewerage charges had been made by the city during the last preceding 12 or 14 years; (3) the city already had outstanding indebtedness for the payment of which the net revenues of the water works system were pledged; and (4) the rates that were being charged by the city for water were excessive when compared with the rates charged in other cities in that area.

The investment bankers after the signing of the contract caused to be prepared and filed with the mayor and board of aldermen a report entitled "Economic and Financial Survey for the City of Natchez, Mississippi." The investment bankers also employed the engineering firm of Black & Veatch to make a supplemental survey and study of the water and sewerage extension needs of the city, based mainly upon the continued growth of the city since the making of the 1947 survey; and the investment bankers also filed with the mayor and board of aldermen a proposed schedule of water and sewerage rates for the city.

Carr testified over the objection of the complainants as to the basis of the fee which had been proposed by the bond houses and which they were to receive under the terms of their contract with the mayor and board of aldermen. Under the terms of the contract the investment bankers agreed to assume the expense of attorneys'

fees to be paid to Messrs. Charles & Trauernicht, bond attorneys, for services to be rendered by them in connection with the issuance and approval of the bonds, the cost of printing the bonds, and the cost of delivery of the bonds to the purchasers. These items of expense were estimated by the investment bankers as follows: For the legal services of the above mentioned bond attorneys, $5,000; for printing and lithographing the bonds, $2,500; for expenses of delivery of the bonds to the purchasers, $750. As to the other items of expense which were taken into account in determining the basis of the charges, Carr testified that the additional engineering expenses to.be incurred by the investment bankers in the development of a financial plan for the issuance and sale of the revenue bonds was estimated at $10,000, and the sum of $5,000 was allowed for the cost of statistical engineering and research services. Other out-of-pocket expenses to be incurred were communication expenses, $1,000, and traveling expenses, $2,500. And an additional amount equal to 20 per cent of all of the above mentioned items was allowed for general overhead expenses. The total of all of these items amounted to approximately $33,000, which Carr testified the investment bankers estimated as the total amount of out-of-pocket expenses to be incurred by them in the performance of the contract. Carr then testified that the 3¾ per cent commission to be paid to the bond houses for their services under the contract included a 1¼ per cent underwriting commission or commitment risk compensation premium, which would amount to approximately $31,000, and a one per cent profit, which would amount to $25,000. Carr testified that the $31,000 referred to above as an underwriting commitment risk compensation premium represented ''reimbursement to us for our risks, for agreeing to make a bid at a specified amount.'' The underwriting fee and the profit represented $56,000 of the $93,750 which the contract provided that the bond houses should receive upon the issuance of $2,500,000 of bonds.

At the conclusion of the hearing the chancellor entered a decree in which he held that the contract entered into on August 23, 1949 by and between the mayor and board of aldermen of the City of Natchez and the investment bankers, or bond brokers, was contrary to law, that the mayor and board of aldermen of the City of Natchez were not authorized by law to enter into such contract, and that the contract was illegal because it undertook to pay to the bond brokers approximately $56,000 for underwriting the issuance of the bonds and as a profit to the bond brokers, and that such payment would constitute a diversion of the funds from the purposes for which the bonds were authorized to be issued. The chancellor also held that the mayor and board of aldermen were without authority to create the indebtedness or to pay the same out of the general funds of the City of Natchez; that the contract was unilateral and subject to cancellation only by the defendant bond houses and in effect constituted a pre-election bid for the bonds. The chancellor ordered that the contract be declared null and void and that the contract be cancelled.

The appellants in their briefs say that the principal issue involved in this appeal is the question of the right of the courts to interfere with or substitute their judgment for the discretion and exercise of discretion of the mayor and board of aldermen in the management of the affairs of the municipality where no fraud of any kind is shown, and particularly in the matters which are under the control, supervision, management and direction of the governing authorities of the municipality; and appellants cite in support of the statement the provisions of Sections 5 and 19 of the private charter of the City of Natchez, which vest in the mayor and board of aldermen the legislative and contracting power of the city, and Section 27 of the charter, which authorizes and empowers the mayor and board of aldermen to provide for the public health of the municipality, and to provide for the establishment

and operation of a water works and sewerage system, and to borrow money and issue bonds for such purposes.

The powers mentioned above are practically the same as the powers which have been conferred by general statutes upon all municipalities of the state operating under the code chapter on municipalities. But the questions presented upon this appeal do not relate to the power of the mayor and board of aldermen to expend the funds of the municipality for the promotion of the public health or for the establishment and maintenance of a water works and sewerage system, or to the power of the mayor and board of aldermen to borrow money and to issue bonds for the above mentioned purposes.

The questions involved in this appeal are whether or not the mayor and board of aldermen of the City of Natchez were authorized to enter into the contract hereinabove mentioned and whether or not the mayor and board of aldermen have a legal right to pay to the above named investment bankers out of the proceeds of the sale of municipal bonds, or out of the general fund of the municipality, the large sum of money called for in the contract in consideration of the services which the investment bankers have agreed to render. We think that both of these questions must be answered in the negative.

It is well settled in this state that the governing body of a municipality possesses only such authority as is conferred upon it by its charter or by general statutes, together with such powers as are necessary to give effect to the powers granted. Town of Clinton v. Turner, 95 Miss. 594, 52 So. 261; City of Hazelhurst v. Mayes, 96 Miss. 656, 51 So. 890; Wise v. Yazoo City, 96 Miss. 507, 51 So. 453, 26 L. R. A., N. S., 1130, Ann. Cas. 1912B, 377; Steitenroth v. City of Jackson, 99 Miss. 354, 54 So. 955; Knight v. Johns, 161 Miss. 519, 137 So. 509; Seward v. City of Jackson, 165 Miss. 478, 144 So. 686.

The power of a municipality to contract with reference to any subject matter must either be expressly conferred

by its charter or by general statute, or necessarily implied therefrom. Fitzgerald v. Town of Magnolia, 183 Miss. 334, 184 So. 59.

In Section 27 of the private charter of the City of Natchez, the city, and thereby the mayor and board of aldermen as the governing body thereof, is authorized and directed to provide for the public health of the municipality and for the establishment and operation of water works and a sewage system, and to borrow money and to issue bonds therefor.

By the general statutes of the state, the governing authorities of any municipality are authorized to erect, maintain and operate water works, and to regulate the same, and to prescribe the rates at which water shall be supplied to the inhabitants. Sections 3422, 3433, Code of 1942. And the governing authorities of a municipality are authorized to issue revenue bonds for the purpose of improving and extending the water works system, the sewerage system and the sewage disposal system of the municipality. Section 3538 et seq. Code of 1942.

The powers thus granted, however, must be exercised in the manner prescribed by law, and the proceeds derived from the sale of the bonds must be expended for the purposes and in the manner authorized by the statute. The bonds as a general rule cannot be issued unless authorized by a majority of the qualified electors of the municipality voting in an election held for that purpose. The amount of bonds to be issued must not exceed the statutory limitations, and the rate of interest must not exceed the maximum rate authorized by law. The bonds must not be sold for less than par. The bonds can be sold only upon competitive bids after legal advertisement therefor, as required in Chapter 325, Laws of 1946.

In Section 3555, Code of 1942, it is expressly provided that all money received from the sale of revenue bonds issued by a municipality for the construction, improvement and extension of public utilities, as provided in the next preceding sections, shall be used solely for the pur-

chase, construction, improvement, enlargement, extension or repair of the public utilities system for which the bonds were issued, including any engineering, legal and other expenses incident thereto.

In the exercise of the powers thus granted, the municipality may contract for the services of such engineers and other assistants as the governing authorities may deem necessary to plan, lay out, construct and maintain its water works and sewerage systems in a proper manner. Civil engineers may be employed to make the necessary surveys and to prepare the necessary plans and specifications for the construction, and to supervise the work after the contracts shall have been awarded. And in like manner the governing authorities of the municipality may employ attorneys to prepare the necessary orders and resolutions, and to supervise the enactment of other necessary legal proceedings for the issuance and sale of the bonds, and may procure the legal opinion of recognized bond attorneys as to the validity of the bonds, so that the bonds may be readily sold to investors. And the governing authorities of the municipality may pay for such engineering services and legal services and other incidental expenses connected with the issuance and sale of the bonds and the construction of such public works out of the proceeds of the sale of the bonds, or perhaps out of the general fund of the municipality. Such expenditures are not only necessary to give effect to the powers granted in the above mentioned statutes, but are expressly authorized by the statutes themselves. ██ ██ But no statute and no decision of this Court has been called to our attention which expressly or by necessary implication authorizes the governing authorities of a municipality to expend any part of the proceeds of the sale of bonds, or any other funds belonging to the municipality, in the payment of an underwriter's commitment risk premium or fee or profit to a group of investment bankers or bond brokers in consideration of a qualified

pre-election agreement by them to make a bid at a specified amount for the purchase of the bonds.

Chapter 325, Laws of 1946, provides that all bonds issued pursuant to any laws of this state by the governing authority of any county, or other political subdivision or instrumentality of the state, shall be advertised for sale on sealed bids or at public auction. Whatever the law may have been prior to the enactment of the 1946 act, we think that it is clear, in view of the above mentioned provisions of that act, that █ in the sale of municipal bonds there is now no room for the services of an underwriter. Neither can the municipal authorities employ an agent to negotiate the sale of the bonds. The statute itself requires that the bonds be sold by the governing authorities of the municipality on sealed bids or at public auction after legal advertisement of the sale shall have been duly published. The statute does provide that if the bonds are not sold pursuant to such advertisement they may be sold by the governing authorities of the municipality by private sale at any time within sixty days after the date advertised for the receiving of bids, but no such private sale can then be made at a price less than the highest bid received pursuant to the advertisement.

In view of the provisions of the 1946 act, we think that it is clear that the governing authorities of a municipality have no power to enter into a contract of any kind for the payment of an underwriter's fee or commission to investment bankers for an underwriter's guarantee of the sale of municipal bonds, or for the purpose of procuring a purchaser for such bonds prior to the advertisement for and receipt of bids, as provided for in the 1946 act, or to enter into a pre-election conditional sales contract for the sale of such bonds.

Neither do we believe that █ the governing authorities of a municipality have a right to delegate to a group of investment bankers the power and authority to procure for the municipality the necessary legal and

engineering services which may be required to enable the municipality to issue and sell its revenue bonds and to construct the public utility improvements contemplated in the contract which we now have before us.

The terms of the contract entered into by the mayor and board of aldermen with the above mentioned bond houses are vague and indefinite on many points; and it has been difficult for the court to determine the exact nature of the obligations which the bond houses assumed under the contract. After the terms of the contract had been made known to other bond houses representatives of several reputable bond houses in Mississippi appeared before the mayor and board of aldermen and offered to perform for the sum of $10,000 the same services that the above named bond houses had agreed to perform for the sum of $93,750. This offer was made for the purpose of showing that the services actually required of the above named bond houses under the terms of the contract as written could have been procured by the mayor and board of aldermen at a very small cost to the city. Nothing appears in the contract as it is written to show that additional engineering services were to be furnished by the investment bankers in connection with the survey which they undertook to make for the city. Nothing appears in the contract to show that water rate studies were to be made and a schedule of proposed water rates prepared at the expense of the investment bankers.

But, according to Carr's testimony, $56,000 of the $93,750 which the investment bankers were to receive for their services, represented an underwriter's risk premium and profit, which the mayor and board of aldermen had no authority to agree to pay.

The powers of a municipal corporation are wholly statutory, and every person who deals with such a body is bound to know the extent of its authority and the limitations on its powers. Edwards House Co. v. City of Jackson, 138 Miss. 644, 103 So. 428, 42 A. L. R. 625; Steitenroth v. City of Jackson, supra, 38 Am. Jur. p. 182.

It is clear that the contract which we have had under review in this case is a contract which the mayor and board of aldermen had no legal authority to enter into, and the chancellor was justified in holding that the contract was illegal and in ordering that the contract be cancelled.

The decree of the lower court is therefore affirmed.

Affirmed.